C. AULTMAN & CO. v. HENRY TROUT.

[FILED JULY 11, 1889.]

1. **Verdict.** The evidence examined, and *held*, to sustain the verdict.

2. **Instructions** given and refused, the giving and refusal of which are complained of, examined, and *held*, properly given, and refused.

ERROR to the district court for Hamilton county. Tried below before NORVAL J.

*Agee & Stevenson*, for plaintiff in error, cited: *Nichols r. Knowles*, 18 N. W. Rep., 413; *Furneaux v. Esterly et al.*, 36 Kan., 539; *Bomberger v. Griener*, 18 Iowa, 477; *Davis v. Robinson*, 25 N. W. Rep., 280; *Nichols v. Hall*, 4 Neb., 210; *Acker v. Kimmie*, 37 Kan., 276.

*R. G. Brown*, for defendant in error, cited: *Sandwich Mfg. Co.*, v. *Feary*, 22 Neb., 53; *Cobbey v. Knapp*, 23 Id., 579; *McBride v. Ins. Co.*, 30 Wis., 568; *Shafer v. Phœnix Ins. Co.*, 53 Id., 361; *First National Bank v. Erickson*, 20 Neb., 580–586.

COBB, J.

This cause is brought to this court on error from the district court of Hamilton county. The plaintiff, below, alleges that it is a corporation duly organized under the laws of the state of Ohio; that on August 5, 1887, it sold and delivered to defendant at Aurora, Nebraska, one No. 9 New Model thresher, with trucks and stacker, also, one flax riddle, and one timothy sieve, for which the defendant agreed to pay $450, and the freight and charges on the machinery from Canton, Ohio, to Aurora, Nebraska, which amounted to $51 at the time of delivery,

to-wit: $51, cash for freight; $125 in one Minnesota Chief separator, to be delivered to A. L. Bishop, plaintiff's agent, and the remainder in three promisory notes, one for $110, with interest from date, payable October 1, 1887; the second for the same amount, with like interest, payable October 1, 1888, and the third for $105, with like interest, payable October 1, 1889; that after receiving said machinery from the plaintiff the defendant refused to pay said freight, and refused to deliver said separator to the plaintiff, or to his agent, and refused, and still refuses, to give his notes for the purchase of the machinery, or for any part thereof; and refuses to make any settlement for the same, to the damage of the plaintiff $503.30.

The defendant answered, denying that he owed the plaintiff said sum, or any part thereof; and denied buying the property described, in the way and manner alleged; but set up that on August 5, 1887, he obtained the property, on trial, with the understanding and agreement that if the machinery failed to do good and satisfactory work, it was to be returned to the plaintiff's agent; and that the same was by the plaintiff warranted to be of good material, and, with proper use and management, to do good work in threshing all kinds of grain and flaxseed, and that upon a careful, competent trial the machinery was found to be so imperfect and defective in its construction and operation that with proper care and management it could not be made to clean grain and flaxseed in a fair and proper manner, and was entirely unfit for the purpose for which it was constructed, and delivered to defendant; that on August 6, 1887, the plaintiff was duly notified of the defective and worthless condition of the machinery, and requested to replace it with good machinery, or to correct, repair, and operate the machinery obtained from him, which request he failed and neglected to comply with; and that on September 1, 1887, being unable to use and operate the machinery on account of its defective condition, and the

plaintiff failing and neglecting to repair the same, as it had agreed to do, defendant returned the same to the plaintiff's agent in Aurora. The defendant further sets up, that the plaintiff is justly indebted to him in $200 for loss of time, and for labor and expense incurred in and about the defective and worthless machinery so obtained from the plaintiff; and prays judgment, etc.

The plaintiff's reply admits that the defendant took the said machine to Aurora, Nebraska, September 1, 1887, and offered to return the same to the plaintiff's agent, who refused to accept the same, and that said machinery, or any part thereof, has never been returned to the plaintiff; and the plaintiff denies every allegation in the second and third defense of defendant not hereinbefore expressly admitted.

There was a trial to a jury with findings and verdict for the defendant; and the plaintiff's motion for a new trial having been heard and overruled, judgment was entered on the verdict for the defendant's costs taxed at $77.63.

The plaintiff assigns the following errors in the record and proceedings of the court below for review in this court:

1. The verdict is contrary to the weight of evidence.

2. It is contrary to law.

3. The court erred in giving instructions Nos. 3 and 4.

4. In refusing to give instruction No. 2 asked by plaintiff.

5. In admitting testimony objected to by plaintiff, and in excluding testimony offered by plaintiff, and duly excepted to.

6. Errors of law at the trial, and duly excepted to.

7. In overruling the motion for a new trial.

8. The verdict and judgment were for the wrong party.

Upon the trial the plaintiff called A. L. Bishop, who testified that he was engaged in machinery business at Aurora as local agent for C. Aultman & Co., plaintiffs; that the defendant called on him at his place of business,

and was looking for a machine, and wanted to know how witness would sell it, and whether witness would trade it for an old machine. Witness told him that he would, and that he would go down in a few days and see what he had; witness went to defendant's place, and saw him, but they could not make any terms. In two, three, or four days thereafter defendant came back; and they made a bargain for a thresher; this was about the 25th day of July, 1887. Witness took his order for the thresher. The duplicate of this order, signed by witness as agent for the plaintiff, and by the defendant, the witness presented and identified, which was received in evidence, and which I here copy:

"WARRANTY.—The above machinery to be warranted to be of good material, and, with proper use and management, to do as good work as any other of its size, made for the same purpose, in the United States. If, inside of five days from the day of its first use, the said machinery shall fail to fill said warranty, written notice shall be given to C. Aultman & Co., and also to the local agent from whom the same was purchased, stating wherein it fails to fill the warranty, and a reasonable time allowed them to get to the machine and remedy the defect, if any there be (if it be of such nature that a remedy cannot be suggested by letter), the undersigned rendering necessary and friendly assistance. If the machinery cannot be made to fill the warranty, that part which fails shall be returned by the undersigned to the place where received, and another furnished which shall perform the work, or the money and notes which shall have been given for same to be returned, and no further claim to be made on C. Aultman & Co. It is further mutually understood and agreed that the use of said machinery after the expiration of the time named in the above warranty shall be evidence of the fulfillment of the warranty, and full satisfaction of the undersigned, who agrees thereafter to make no other

claim on C. Aultman & Co. And further, that if the above machinery, or any part thereof, is delivered to the undersigned before settlement is made for same as herein agreed, or any alteration or erasures are made in the above warranty or in this special understanding or agreement, the undersigned waives all claims under this warranty. It is expressly understood that all agreements appertaining to this order are included in the above."

The witness proceeds to state that the defendant took the duplicate, and witness sent the original to the company at Council Bluffs, to forward the machine; that witness was to take the old machine as part payment at the price of $125; that the machine came and was delivered to defendant on August 3, 1887; that defendant came up and took the machine home with him, and witness sent out two men, Preston and Pike, to set it up; that Pike was the expert to start it; that the defendant has never paid for the machine, nor any portion of the price, and has never delivered the old machine in part payment; that witness has called upon him to deliver the old one, and settle up the balance for the new machine, which he has never done. On cross-examination the witness said that he went down there to attempt to fix the machine on or about the 23d or 24th days of August. In answer to defendant's counsel, as to whether the notes were given at the time the machine came, he said they were not.

Q. What was the reason?

A. The defendant wanted to take the machine out and try it the next day and see how it run.

Q. You consented for him to take the machine, and have a trial in that way?

A. In that way, yes, sir.

Q. When did he return the machine? [Objected to by plaintiff, as not proper, and objection sustained by the court.]

The case on the part of plaintiff being closed, the de-

feudant was sworn as a witness in his own behalf, and stated that the signature to the plaintiff's "Exhibit A," set forth, was his; that it was given to him by A. L. Bishop; that he took a threshing machine from Bishop; that the price was $325; that the plaintiff, as represented by Bishop, was to take an old threshing machine in part payment. In answer to the question, "How much was you allowed for the old threshing machine?" he answered: "Well, it was nothing said, but just as we make the bargain with him, he tell me when I can get $40 for that machine, to let him have it up here."

By counsel:

Q. At the time you gave this contract did you read it over?

A. No; I cannot English read at all; I cannot much talk English.

Q. You could not read the contract?

A. No.

Q. Did Mr. Bishop read it over to you?

A. Well, he read it. I don't know what he read; I can't verstehen, I can't read any English. I don't know what he read.

Q. You don't know then whether he read this contract over to you or not, do you?

A. No, sir; I don't know that.

Defendant further testified that the machine was set up on his place, on the 4th of August, by two men, agents of the plaintiff, whose names he does not state; that when he set it up he said there was something broken in the machine, and he had to go home the next day.

As near as I can understand, from the broken and imperfect English of the witness, which seems to have been taken down verbatim by the reporter, he states that there was something broken in the machine at the time he got it, or was broken on the way from Aurora to his farm, which the agent had to go back to Aurora to have supplied, and

returned again on the 5th of August; that on his return they fixed something in the machine, when they undertook to run it; that he then stated to the agent that it looked like the machine would not run, whereupon the agent said that he would come back in about three days, that he could not tell then whether the machine was all right or not, but when he got back, and got all that belonged to the machine, that it would then go, and then defendant might pay for it; that defendant told the agent he didn't like to pay until the machine would do better than it then did; that if it did do better he would keep it; that they threshed all that afternoon and succeeded in only threshing out eight bushels of flax; that the agent never came back at all. The witness proceeded to explain, in his way and language, the respects in which the machine would not run, and to give reasons therefor, which were doubtless understood by the jury, at the trial, but are deemed unnecessary to repeat here. The conclusions of it were that the machine would not elevate; that after trying to run it for some time, probably to the 6th of August, defendant and his wife went to Aurora, and to Bishop, the agent, and notified him that the machine did not run well; that the elevator stopped; that he would have to fix it and make it run better, and that Bishop replied, in words that I understand to mean, that they must have a man from the factory to put it in order; that he told Bishop he was to have five days to write, and that the five days were pretty soon up; that Bishop replied to the effect that five days would expire too soon; that a man would be out from the factory, and that it would take more than five days to put the machine in order and properly test it; that he returned home that day and continued his efforts to run the machine, but without satisfaction or success.

On Thursday, but whether the next Thursday after the last interview between defendant and Bishop, which was on Monday morning, does not appear, but probably it was, the defendant undertook to do threshing for one Rich, who

being dissatisfied with the work of the machine, compelled him to stop, after which the defendant drove immediately to Aurora, called on Bishop, informed him that the elevator stopped, and would not clean the grain and the flax any better, demanded of him to go and fix the machine, and if not, that he would not pay for it; that Bishop replied either that he had sent or would send—it is not easy to understand the exact meaning of the witness—by telegraph, "so that there comes a fellow out of the factory for to fix the machine;" that Rich having refused to let him thresh his grain, defendant had taken the machine back to his own place, and the company's agent, doubtless the same "fellow out of the factory," came, four or five days afterwards, for the purpose of fixing the machine; that the agent tightened the belts, and broke one of the castings, telling defendant that the casting wasn't of much account, and he would send him another one — "he tightened the belts awful tight, and the elevator he stopped, and break some laths off," are the expressions of the defendant: that the agent stayed a couple of hours; that after the agent went away defendant tried for four or five days to run the machine, but without better success than before the agent attended to it.   At the expiration of four or five days, instead of that agent continuing, Bishop came out there, "and another fellow, yet," and tried to fix the machine, bringing a casting to replace the one that the other agent broke, and bringing along some laths for the elevator, and, for about two hours "they made the machine thresh middling good," but after an hour and a half, or two hours, they broke five laths, or slats, out of the elevator; they tried to run it, that day, till night, when they stopped, and took the machine to the house, and took the elevator out.

On Friday, defendant went to Aurora, "and take him along here," whether the whole machine, the elevator alone, or otherwise, is not expressed, and told Bishop that he did not like the way the machine worked, as he himself knew ;

that it was not good, and he wouldn't pay for it; that Bishop told him he would come over next Monday and try the machine; also told him "you try the machine one way, and another, and you not get the machine to run, then you not have to keep it; and if you make him run you have to take him;" witness "told him all right;" then Monday, Bishop did not come; defendant waited a week, and on the next Saturday went again to Bishop, and asked him, "How is this, Mr. Bishop, with that elevator, you not have him? Well, he tell me he take the elevator out Monday, and he take him out by another fellow, if he could. I ask him if he fix the elevator, and he tell me, yes, he fix him; I tell him if you not come any more, that is more than I stand, I bring your machine over here; he tell me, you wait a week, you wait a little, I come over next Monday and fill out my contract better."

The witness further stated that Bishop did not come out on Monday, but on Wednesday, following, when he was absent, and brought the elevator, put it on the machine, put in some slats, and went away and left it. The defendant then took the machine to Aurora and delivered it to Bishop. This he says was on the 17th or 18th of August, and he testified further that he did not notify the plaintiffs directly of the failure of the machine to work within five days after he first attempted to run it; and that the reason why he did not, was, that Bishop the agent, told him, as before stated, during the five days, that he would telegraph for him, and do everything in that respect which was necessary for him to do; that he would telegraph to the factory, which the defendant understood to be all that he was required to do.

Defendant was cross-examined at length by counsel for the plaintiff without material difference in the substance of his testimony. His testimony in regard to the manner of the running and insufficiency of the threshing machine, and the quality of the work it did, was in great part corrob-

orated by that of six other witnesses; that portion in regard to calling on the agent, Bishop, the first time, and the communications which passed between them, by the testimony of· his wife, Elizabeth Trout; and in respect to the return of the machine to the agency, by that of his son, Henry Trout, jr.

The plaintiff recalled Bishop in rebuttal, who contradicted most of the evidence of the defendant, and also called, and examined, six additional witnesses, whose testimony corroborated that of Bishop in the most important particulars.    But in respect to the running of the machine and the quality of the work which it did, there is presented a clear case of conflicting testimony, and whichever way and for whichever party the jury may have found the facts, there would be found sufficient evidence to sustain their verdict.

There was a departure from the terms of the order, warranty, or contract, whichever it may be called, at the inception ·of the transaction; and it appears to me, from the examination of both parties, that it was not a sale within the terms of the contract.    By its terms, the delivery of the threshing machine to the defendant, before a settlement was made, is declared to be a waiver of all claims under the warranty, and yet, by his own testimony, the agent of plaintiff, through whom the contract was made, consented that defendant should take the machine out and try it, and see how it would run, without having executed the notes, or paying the freight, or delivering the *old thresher*, which was to be taken in part payment.

I do not think that any court, considering the lack of .defendant's ability to understand the English language, and to read the contract itself, and considering the superior intelligence and business capacity of the agent, would hold the defendant to the strict letter of the contract, under these circumstances.    And even had the defendant been capable to read and understand it, the contract nowhere gave the

residence, or postal address, of the plaintiff, by which notice might be sent him.

It appears from the evidence, that the general agents of the plaintiff, to whom the local agent, Bishop, was no doubt primarily responsible, resided and kept their business office at Council Bluffs, Iowa, something more than 100 miles distant from the defendant, while, as is claimed, the plaintiff resides and carries on his business at Canton, Ohio, nearly a thousand miles away. There can be no doubt, from the testimony which was accepted by the jury, that within less than five days from the commencement of the defendant's effort to run the threshing machine he applied to the local agent and notified him that the machine did not operate satisfactorily, and required him to put it in order, to make it run in accordance with the terms of the warranty ; that the local agent then promised him to write to the general agency at Council Bluffs, and have an expert, in the plaintiff's employment, sent on to remedy the defects complained of. It should have been stated that when Bishop, the local agent, allowed the defendant to take away the machine and try it, outside of the terms of the written contract, he also, outside of those terms, sent a local expert machinist with him to set it up, complete for running, but, as it appears, without much success. It will be observed that upon Bishop, the local agent, telegraphing the general agent at Council Bluffs, in accordance with his promise to defendant, the expert machinist in the employment of the plaintiff was absent on similar business in a distant county of the state, so that considerably more than five days had elapsed before it was possible for him to reach Hamilton county, or the place of residence of the defendant; but this expert, F. E. English, finally did appear, and worked on the machine, endeavoring to put it in order and make it run satisfactorily in accordance with the terms of the warranty.

Upon the evidence of these facts the court gave to the

14

jury the instructions complained of, Nos. 3 and 4, as follows:

"3. You are instructed that, by its terms, the warranty provides that if inside of five days from the day of the first use of said machine it shall fail to fill the warranty, the defendant shall give written notice to the plaintiff and to the local agent from whom the machine was purchased, stating wherein it fails to fill the warranty. If you find that the defendant within five days after starting said machine gave the local agent verbal notice stating wherein he claimed the machine failed to fill the warranty, and that such local agent notified the general agent of plaintiff to send an expert to fix or adjust said machine and that said general agents then sent an expert to said machine to fix and adjust it, and said expert did attempt to adjust the same and failed, this would be a waiver of the written notice required by the warranty.

"4. If you find from the evidence that the machine, with proper use and management, would not and did not do as good work as any other machine of the same size, and you further find from the evidence that the defendant within five days after starting said machine gave the local agent verbal notice stating wherein he claimed the machine failed to fill the warranty, and that such local agent notified the general agents of the plaintiff to send an expert to fix said machine and that said general agents then sent an expert to said machine to fix and adjust it, and that said expert attempted to adjust the same, and you further find that said expert failed to adjust the same so as to, with proper use and management, do as good work as any other machine of the same size in the same kind and condition of grain, and that the defendant thereafter within a reasonable time returned said machine to the plaintiff's local agent, then your verdict should be for the defendant."

And the court refused to give instruction No. 2, asked by the plaintiff, as follows:

" If you find that the defendant did not give written notice to the plaintiff of the alleged defects in the machine, within five days from the time of the first use of the machine, then you must find for the plaintiff and assess its damages at the contract price of the machine with seven per cent interest thereon from August 5, 1887."

It sufficiently appears from the testimony of Bishop and English on the part of plaintiff that it had a general agency at Council Bluffs for the management of its business in this state, and that a duty of said agency consisted in the employment of one or more expert machinists, experienced in the running, repairing, and adjusting of its machines, and that it was the special business of the expert, upon the agency being called on for that purpose, to attend upon the local agency in order to remedy defects complained of in its machines, sold at the local agencies, and in effect to make good the terms of its warranty.

It is obvious that had the defendant written to the plaintiff at Canton, Ohio, giving notice that the machine bought of local agent Bishop, at Aurora, would not work, the only thing the plaintiff would have done would have been to write or telegraph to its general agency at Council Bluffs to send English, or other expert, to Aurora, Neb., to see what was the difficulty with the defendant's machine, and to remedy any defect found in it. Exactly this was done, through the correspondence of the local agent, and such being the case, to now hold that the defendant had forfeited his rights under the warranty, by failing to do the formal and supererogatory act of writing a letter to the plaintiff, to an address probably unknown, to request something already being done, or attempted to be done, through the same means, to be provided by the plaintiff for the same purpose, would be but a substitution of formalities for practical execution, and of technicalities for business sense.

I think the trial court took the correct view of the case, and that the instructions given were proper, and were ap-

plicable to the evidence and the law of the case. The plaintiff's instruction, being but the negative proposition of those given, was properly refused by the court. The errors assigned as to the admission of testimony for the defendant, and the exclusion of that offered for the plaintiff, and as to errors of law, excepted to on the trial, not being argued by the plaintiff in error, will not be further considered here.

The judgment of the district court is affirmed.

JUDGMENT AFFIRMED.

THE other Judges concur.